

**Signed and Filed: July 26, 2011**

_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Bankruptcy Case |
| JAMES WILKES MILNES, | No. 10-33136DM |
| Debtor. | Chapter 7 |
| XINYU XIANG and HANSHU DING, | Adversary Proceeding |
| | No. 10-3191DM |
| Plaintiffs, | |
| v. | |
| JAMES WILKES MILNES, | |
| Defendant. | |

MEMORANDUM DECISION
ON COMPLAINT TO EXCEPT DEBT FROM DISCHARGE

I.    INTRODUCTION

Xinyu Xiang ("Xiang") and Hanshu Ding (collectively "Plaintiffs")

initiated this adversary proceeding by filing a complaint (the

"Complaint") against James Wilkes Milnes ("Debtor"). The Complaint sought damages in the minimum amount of $125,000 plus prejudgment interest; a determination that the Plaintiffs' claim is nondischargeable; punitive damages; and attorney's fees and costs of suit.

More specifically, by the first claim for relief, Plaintiffs sought a determination that their claim is nondischargeable under 11 U.S.C. § 523(a)(2)(A).[1] Plaintiffs contended that prior to the filing of his chapter 7 petition, Debtor made misrepresentations, omissions, suppressions, and concealed material facts regarding a land investment deal that Plaintiffs justifiably relied on and caused them to invest $100,000 in real estate with an assured recovery of $125,00, none of which they recovered.

By the second claim for relief, Plaintiffs sought a determination that their claim is nondischargeable under § 523(a)(4). Plaintiffs contended that Debtor agreed to manage Plaintiffs' investment, and engaged in fraud and defalcation while acting in a fiduciary capacity.

By the third claim for relief, Plaintiffs sought a determination that under § 523(a)(6) their claim is nondischargeable. Plaintiffs contended that Debtor willfully and maliciously injured them by purposefully deceiving Plaintiffs regarding their real estate investment, and caused them to lose $100,000.

The matter was tried to the court on July 12, 2011; appearances

---

[1] Reference to the "Bankruptcy Code" is to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101, et seq. Unless otherwise indicated, references to statutory sections are to sections of the Bankruptcy Code.

were noted in the record.  Having considered the testimony of the witnesses, the documentary evidence, and the arguments of the parties, for the reasons to be explained below, the court will enter a judgment declaring Plaintiffs' claim in the amount of $125,000 (plus prejudgment interest from July 2, 2009, at the rate of 10% per annum) is nondischargeable pursuant to § 523(a)(2).

On the second and third claims for relief the court concludes that Plaintiffs did not meet their burden of proof and the claims will be dismissed.

II.    FACTS[2]

Debtor was president of JB Land Development, LLC ("JB Land").  JB Land purchased undeveloped real estate and attempted to increase the value of the land through development.  JB Land solicited investors to fund its development projects.  In accordance with JB Land's business model, investors purchased a fractional interest in a parcel of property as tenants-in-common with JB Land.  The typical contract that investors signed contained a provision requiring JB Land to buy back the interest in the land sold to the investor within two years; the buy-back price in the typical contracts was 150% of the purchase price.

JB Land owned eight to nine parcels of land and at various times engaged in the development of a senior center, an equestrian center, and other projects.  No project was ever fully developed and constructed.  JB Land successfully executed a buy-back of an investor's stake in a parcel of land on one occasion.  In that instance, JB Land

_____

[2] The following discussion constitutes the court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052(a).

purchased undeveloped property and a short time later was able to sell that land for approximately twice its purchase price. The land had not been developed in any meaningful way and the increase in value was largely the result of the land having been previously undervalued.

Debtor was an experienced real estate broker and a former real estate appraiser. His primary role at JB Land was to utilize his valuation skills to identify land that would be appropriate to purchase and develop. Also, Debtor focused on the feasibility of developing land. Debtor customarily did not recruit new investors for JB Land. Debtor's fellow owner of JB Land usually recruited investors, but Debtor did meet with Xiang. Xiang was an engineer and did not have experience or expertise in real estate.

On June 12, 2007, Debtor, on behalf of JB Land, met with Xiang and discussed JB Land's business and the opportunity for investment. Xiang was put in contact with Debtor after responding to a message advertising investment opportunities posted on an online message board that focused on investors in Plaintiffs' locale. At the meeting Debtor gave Xiang two documents: a cover sheet introducing JB Land's business model and a more detailed brochure that described the company and emphasized the quality of the investment opportunities. During the meeting Debtor discussed with Xiang a 9.32 acre parcel of land in Kern County, California (the "parcel") that JB Land was working to develop. Debtor told Xiang that JB Land intended to construct mini-warehouse storage units ("mini-warehouse") on the parcel and lease the storage space to customers. Additionally, he stated that JB Land was seeking

investors to assist in financing the development of the parcel.

In accordance with JB Land's customary business practice, investors would purchase an interest in the parcel and be tenants-in-common with JB Land, which retained a "controlling" interest in it. Debtor informed Xiang that after a two-year period, or potentially earlier, JB Land would buy back the investors' interest in the parcel at an increased price, as dictated by JB Land's standard contractual agreement. The source of the buy-back funds would come from the construction of the mini-warehouse, which would provide rental income and increase the value of the parcel. Debtor stressed to Xiang that the investment opportunity was limited because JB Land was only seeking approximately $2.7 million to fund the development and it was important to act quickly. Debtor also told Xiang that JB Land had successfully completed a buy-back agreement with another investor, and had repurchased that investor's interest in one year. At the conclusion of the meeting, Xiang requested that Debtor send him a copy of an appraisal of the parcel.

Debtor sent Xiang a letter of value. The letter of value was prepared by an appraisal company and stated a projected value of the parcel of $6.95 million. The projected value was based on the assumption that the parcel had been fully developed and the proposed mini-warehouse had been constructed. Shortly after receiving the letter of value, Plaintiffs decided to make an investment with JB Land. The investment was memorialized in two documents, a Vacant Land Purchase Agreement and Joint Escrow Instructions ("Vacant Land Purchase

Agreement"), and a Purchase Agreement Regarding 9.32 Acres of Prime M-1 Industrial Land ("Purchase Agreement Regarding 9.32 Acres"). Plaintiffs signed the documents on June 23, 2007, and June 25, 2007, respectively. The Vacant Land Purchase Agreement provided that Plaintiffs would purchase a 2.5% tenancy in common interest in the parcel for the price of $100,000. The Purchase Agreement Regarding 9.32 Acres described the escrow process that would be used to transfer the $100,000 to JB Land. It also contained the buy-back provision, a description of Plaintiffs' recourse if JB Land defaulted on the buy-back, and a personal guarantee of the terms of the agreement by Debtor and the co-owner of JB Land.

The buy-back provision, as set forth in the Purchase Agreement Regarding 9.32 Acres, provided that JB Land would buy all of the Plaintiffs' interest in the parcel on or before July 1, 2009, for $125,000. Additionally, if JB Land failed to purchase all of Plaintiffs' interest by July 1, 2009, Plaintiffs would be allowed to retain their ownership interest or sell their interest; if Plaintiffs opted to sell and the sale of their interest netted less than $125,000, Plaintiffs could seek payment of the difference from JB Land and the two guarantors.

In or around 2007, JB Land raised $2,695,200 from investors who purchased interests in the parcel. Of the money raised to develop the parcel, $400,000 was used for various development activities including clearing the land, installing cyclone fencing, beginning the process of grading the land, and various other steps were taken to develop the

parcel. It is not clear what the remaining $2.295 million was used for. What is clear is that the money was not allocated to specifically fund development of the parcel but was appropriated for other undocumented uses. At trial, Debtor confirmed that JB Land did not necessarily use the money that was raised from investors purchasing interests in land to develop that particular parcel of land. Plaintiffs were never paid the $125,000 owed to them and continue to hold their 2.5% interest in the parcel, which, according to Xiang, is effectively worthless.

Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code on August 13, 2010 (the "Petition Date"). Plaintiffs filed the complaint on November 12, 2010. The court entered an order discharging the Debtor on November 23, 2010.

III.    <u>DISCUSSION</u>

The court is faced with the task of determining whether Debtor induced Plaintiffs to invest in JB Land based on false pretenses, through false representation, or through actual fraud, whether Plaintiffs justifiably relied on Debtor's conduct and representations, and consequently, whether Plaintiffs' claim is nondischargeable. Debtor contended that he acted in good faith towards Plaintiffs and did not misrepresent the nature of JB Land and its involvement with the parcel, nor did he omit any material fact. In contrast, Plaintiffs pointed to the documents received at the initial meeting with Debtor and the oral representations made at that meeting. On balance, the preponderance of the evidence supports the court's conclusion that

Case: 10-03191    Doc# 36    Filed: 07/26/11    Entered: 07/27/11 17:06:40    Page 7 of 23

Plaintiffs' claim is nondischargeable.

Section 523 of the Bankruptcy Code dictates when a debtor is not entitled to a discharge of certain debts. Section 523(a)(2)(A) provides that a debt may not be discharged if it was obtained by "false pretenses, a false representation, or actual fraud." § 523(a)(2)(A). Those terms are not defined in the Bankruptcy Code; however, the United States Supreme Court has held that the terms "carry the acquired meaning of terms of art. They are common law terms, and . . . in the case of "actual fraud," . . . they imply elements that the common law has defined them to include." Field v. Mans, 516 U.S. 59, 69 (1995).

The Bankruptcy Code is designed to give the honest, but unfortunate debtor a fresh start in bankruptcy; thus exceptions to discharge should strictly construed against the creditor and liberally in favor of the debtor. Landsdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1994). A creditor must show that the debtor engaged in "blameworthy" conduct in order to successfully except a debt from discharge. In re Anderson, 181 B.R. 943, 948 (Bankr. D. Minn. 1995). Hence, the creditor bears the burden of proving the debtor's dishonesty; that burden is satisfied by establishing by a preponderance of the evidence five elements:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000).

Each of the five Slyman elements will be addressed in turn.

A. Misrepresentation, Fraudulent Omission, or Deceptive Conduct by the Debtor

Plaintiffs contended that Debtor engaged in misrepresentation, fraudulent omission, or deceptive conduct at least three times when interacting with Plaintiffs: when providing documents at the initial meeting; when making verbal representations at the initial meeting; and in an e-mail that contained the letter estimating the value of the parcel.

Debtor provided misleading documents to Plaintiffs at the initial meeting. The brochure given to Plaintiffs stated that "[i]ndividual investments are aggregated and matched with the appropriate real estate." This statement purportedly described JB Land's business model, which involved estimating the potential value of undeveloped land if it were developed and then allowing investors to purchase a percentage interest in the land based on a value derived from the projected developed value. In theory, investments would be recouped when the land appreciated to the speculated value.

In the present case, the parcel was given a projected developed value of $6.95 million; that price was then reduced by 40% to $4 million. JB Land then sold interests in the parcel, ranging from 1.25% to 25%, to eleven different investors and retained a 32.62% interest in the land. The eleven investors owned a 67.38% share in the parcel, which represented an investment of $2,695,200. The parcel was originally purchased for $179,000, and is presently worthless. There

was no appraisal of the parcel's actual value at the time JB Land was procuring investors. Due to Debtor's representations, Plaintiffs' investment was obtained on the premise that it would be aggregated with other funds from the other purchasers of interests in the parcel, matched with the appropriate real estate, and, according to the brochure, used to "develop or otherwise add value to the land." In actuality, JB Land did not earmark Plaintiffs' funds to a specific development project; rather, it used a portion of the funds to aid development of various parcels. In sum, the statement in the brochure that Plaintiffs' investment would be designated for development of the parcel was a misrepresentation.

Debtor's verbal statements to Xiang at the initial meeting contained misrepresentations. Debtor made verbal representations that JB Land was seeking investors to invest in the development of the parcel and those investors' funds would be used to construct the mini-warehouse and lease the storage space. Additionally, Debtor emphasized to Plaintiffs the low-risk nature of the investment. Debtor contended that because Plaintiffs were purchasing an interest in real estate at a "bargain price," if development faltered their investment would be secured by that interest. However, the price Plaintiffs paid for their interest in the purchase can only be considered a bargain if the parcel was valued at $4 million or $6.95 million, values which were dependent upon the parcel being fully developed. In reality, Plaintiffs, for $100,000 purchased a 2.5% interest in real estate that was closer in value to $179,000 than to $4 million. Even assuming that the property

had increased in value from when it was purchased, Plaintiffs did not receive a bargain price on their investment and their investment was not low-risk, but was contingent on the successful completion of the development process.

At trial, Debtor testified that the development process was generally complicated and could contain unforeseeable risks and uncertainties; in contrast to Debtor's claim that the investment was low-risk, this was not conveyed to Plaintiffs. In sum, Debtor knowingly made the following verbal misrepresentations: Debtor told Plaintiffs their investment would be used to develop the parcel and construct the mini-warehouse, when in fact the funds were used for various purposes; Debtor told Plaintiffs that their investment was low-risk, when in fact the investment was subject to the complicated and risky development process; and Debtor told Plaintiffs that their investment was secure because they had purchased an interest in real estate at a "bargain price," when in fact the price paid for the real estate could only be justified if the property was fully developed.

The court finds that the e-mail sent to Plaintiffs on June 27, 2007, was not misleading. The e-mail included the letter of value projecting the value of the parcel at $6.95 million and contained no indication that it should not be considered true and accurate. The letter of value was prepared by a third-party and explicitly stated that the estimated value was based on the assumption that the proposed mini-warehouse project was completed. Debtor stated that he sent the letter of value to Plaintiffs to establish the value of the parcel when

all improvements were completed.  Although assuring a potential investor of the security of an investment by providing a valuation based on future conditions being satisfied may not be standard practice, transmission of the letter of value to Plaintiffs does not establish fraudulent conduct or misrepresentation.

Nevertheless, due to the written and verbal representations made to Xiang at his meeting with Debtor, Plaintiffs have established by a preponderance of the evidence that Debtor engaged in misrepresentation. Thus, the first Slyman element is satisfied.

B.  Knowledge of the Falsity or Deceptiveness of his Statement or Conduct

Knowledge may be proven "by circumstantial evidence and inferred from the debtor's course of conduct." In re Ortenzo Hayes, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004).  In addition, knowledge of the falsity or deceptiveness of one's conduct may be established by showing reckless indifference to the truth or falsity of statements.  Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 167 (B.A.P. 9th Cir. 1999).

Debtor's course of conduct may be examined in the totality of the circumstances in order to determine whether a reckless indifference to the truth and intent to deceive existed.  Id. at 167-68.  Debtor acted as an appraiser and a broker before his tenure at JB Land, and had over twenty years of real estate experience.  Debtor acted as the president of JB Land.  Although his primary responsibilities at JB Land were related to determining the value of land and the feasibility of

development projects, on at least one occasion he solicited investors. Debtor also assisted in the editing of the coversheet and brochure given to Plaintiffs.

Debtor, as an editor of the documents, presumably was aware of their content. However, even assuming that Debtor only edited sections of the documents that did not contain misrepresentations, had not read the documents in full, and was therefore unaware of the misrepresentations the documents contained, his knowledge may still be established by finding he acted with a reckless disregard for the truth. In other words, "[r]eckless reliance by a debtor on the statements of another may be grounds for non-dischargeability even where the debtor had no actual knowledge that the statements made to plaintiff were false." Visotsky v. Woolley, 145 B.R. 830, 835 (Bankr. E.D. Va. 1991) (citing, among other cases, In re Houtman, 568 F.2d 651 (9th Cir. 1978) overruled in part on other grounds by Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015 (9th Cir. 1997)).

Here, although it is likely that Debtor had actual knowledge of the contents of the one-page cover sheet and twelve-page brochure that he provided to Plaintiffs, distributing documents emblazoned with his company's name and his own name without confirming their content and verifying the accuracy of the documents shows a reckless disregard for the truth. Conduct is reckless when a known or obvious risk from which it is highly probable harm will follow is disregarded. Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 49 (2007). Despite the contentions of the twelve-page brochure, an experienced real estate or investment

professional knows that few investments are "sure things" when returns of twenty-five to fifty percent are contemplated.

Debtor was aware that investments carry varying levels of risk, and presented this investment as a low-risk investment, despite the potential for unforeseen complications in the development process. In addition, Debtor's experience as a real estate professional and his position as president of JB Land would have allowed him easily to discover the errors if he had investigated the contents of the document before presenting it to Plaintiffs.[3] Despite Debtor's representation that the investment opportunity was low-risk, financial harm to Plaintiffs was highly probable; hence, it was reckless conduct for Debtor to present documents that contained misrepresentations in conjunction with a solicitation for investment.

Moreover, Debtor knowingly misrepresented that Plaintiffs' funds would be used to develop the mini-warehouse on the parcel and that Plaintiffs would be secured in their investment because they would have purchased an interest in real estate at a "bargain price." First, Debtor, as president of JB Land, was aware that JB Land did not earmark funds to specific development projects, but rather allocated the funds to whatever project would benefit most from the funds. Second, the court infers that Debtor, as an experienced real estate professional, knew that the parcel's pre-development value could not justify characterizing a purchase price of $100,000 for a 2.5% interest as a

---

[3] At trial, Debtor was unable to explain the meaning of the statement "Individual investments are aggregated and matched with the appropriate real estate."

"bargain price" that would secure Plaintiffs from risk of loss.

In sum, Plaintiffs proved by a preponderance of the evidence that Debtor made verbal statements that he knew to be misrepresentations at the meeting with Xiang and provided informational documents that he knew contained misrepresentations, which together were the basis for obtaining the $100,000 investment from Plaintiffs.

   C.   An Intent to Deceive

An intent to deceive can rarely be proven by direct evidence establishing the debtor's state of mind, thus "[a] court may infer fraudulent intent from various kinds of circumstantial evidence." Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987); Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (9th Cir. BAP 1999). An intent to deceive "may properly be inferred from the totality of the circumstances and the conduct of the person accused." In re Ormsby, 591 F.3d 1199, 1206 (9th Cir. 2010).

For example, in In re Young, a case with facts very similar to the present case, the United States Bankruptcy Court for the Southern District of California inferred an intent to deceive from the inclusion of the words "Note Secured by Deed of Trust" on documents created to record an investment, when the investment was not actually secured by a deed of trust. In re Young, 208 B.R. 189, 201 (Bankr. S.D. Cal. 1997), abrogated on other grounds by Cohen v. De La Cruz, 523 U.S. 213 (1998). The court inferred from the debtor's real estate experience that the words "Note Secured by Deed of Trust" were not included by mistake, and that debtor intended the misrepresentations to deceive investors. Id.

Case: 10-03191   Doc# 36   Filed: 07/26/11   Entered: 07/27/11 17:06:40   Page 15 of 23

at 201.

Like the debtor in <u>Young</u>, here, Debtor, an experienced real estate professional, made representations to Plaintiffs with an intent to deceive. The written documents gave the impression that the investment funds would be secured by a deed of trust and that the funds would be dedicated to development of the particular real estate. However, the funds were not dedicated to development of a specific property. Additionally, Debtor made verbal representations regarding the dedication of investment funds to the development of the parcel and claimed Plaintiffs' investment would also be secured by the value of the parcel. Both statements were misrepresentations, and in conjunction with the written misrepresentations they were used to induce Plaintiffs to invest in JB Land. The misrepresentations were designed to make the investment opportunity more attractive and reduce any fears of risk. Thus, based on the documentary and evidentiary record the court infers that Debtor made the written and verbal representations with an intent to deceive.

> D. <u>Justifiable Reliance by the Creditor on the Debtor's Statement or Conduct</u>

Justifiable reliance, as opposed to reasonable reliance, "is a minimal, subjective standard that encompasses 'a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" <u>In re Hill</u>, 425 B.R. 766, 777 (Bankr. W.D. N.C. 2010) (citing <u>Field v. Mans</u>, 516 U.S. 59, 71

(1995)).  Moreover, a plaintiff does not have an automatic duty to investigate the accuracy of statements or conduct, but a duty may inure "when the surrounding circumstances give red flags that merit further investigation; this analysis turns on 'an individual standard of the [creditor's] own capacity and the knowledge which he has.'"  In re Sharp, 340 Fed. Appx. 899, 903 (4th Cir. 2009) (citing Field, 516 U.S. at 72) (bracketed text in original).

For example, in In re Kane the United States Bankruptcy Court for the District of Massachusetts found that creditors had justifiably relied on the statements and conduct of a debtor who conducted a telemarketing operation that solicited investors.  In re Kane, 212 B.R. 697, 699, 701 (Bankr. D. Mass. 1997).  The debtor made oral and written representations about the nature of the investments to clients initially contacted by telephone; after the initial contact by telephone those persons interested in investing were contacted again by phone and mail.  Id.  The court determined that the investors were not sophisticated and the repeated oral representations and the information contained in brochures mailed to the investors gave investors "no reason to suspect that they were being defrauded.  Therefore, their reliance was justifiable."  Id. at 701.

As in Kane, there was nothing in the representations made to Plaintiffs that raised a red flag or would have required further investigation.[4]  Plaintiffs recognized Debtor as an experienced and

---

[4] Although the high rate of return on the investment may appear to be a red flag, when viewed in conjunction with the fact that Debtor informed Plaintiffs JB Land had successfully completed a buy-back at 150%, any

accomplished real estate professional and relied on his representations as accurate. Xiang testified that Plaintiffs based their decision to invest in JB Land on the representations made by Debtor. That reliance was justifiable. Plaintiffs did not have expertise in real estate investment and nothing in their backgrounds provided a basis for determining that the representations were not factual at the time they were made. Thus, Plaintiffs have shown by a preponderance of the evidence that they justifiably relied on Debtor's representations.

E. <u>Damage to the Creditor Proximately Caused by its Reliance on the Debtor's Statement or Conduct</u>

Section 523(a)(2)(A) limits non-dischargeability to "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" the fraudulent conduct. § 523(a)(2)(A). Courts have struggled to interpret precisely what damages are contemplated under § 523(a)(2)(A), but the United States Supreme Court in <u>Cohen v. de la Cruz</u> concluded that the text of § 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees and

---

duty to investigate was met when Xiang asked for an appraisal of the parcel. The Supreme Court, in its discussion of the duty to investigate, relayed a pertinent example:

. . . if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand . . . a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has no experience with horses. <u>See Field</u>, 516 U.S. at 71 (quoting *Restatement (Second) of Torts* § 541 cmt. a).

In the present case, although a return of 25% may have appeared as a red-flag to an experienced investor, Plaintiffs were not experienced investors and had no reason to view a 25% return as suspicious.

other relief that may exceed the value obtained by the debtor." Cohen v. de la Cruz, 523 U.S. 213, 223 (1998).

The court finds that at the least Plaintiffs suffered damages in the amount of $100,000. The contract Plaintiffs entered into provided that Plaintiffs purchase an interest in the parcel for $100,000 and at the end of two years JB Land would buy back their interest for $125,000. The $100,000 purchase price was obtained by Debtor's misrepresentations and directly arose from the fraudulent acquisition, and should therefore be nondischargeable. Moreover, the contract entered into between JB Land and Plaintiffs contained a provision making Debtor personally liable for the full repurchase price of $125,000. The provision provided: "This contract is guaranteed by the principals of J B Land Development who hereby confirm their personal liability with the following signatures." Immediately below this provision was the Debtor's signature. Thus, Debtor was personally liable through contract for the repurchase price of $125,000. Had the terms of the contract been fulfilled Plaintiffs would have earned $25,000 on their initial $100,000 investment. In sum, Plaintiffs established by a preponderance of the evidence that they suffered damages of $125,000 that were proximately caused by Debtor's fraudulent conduct and Debtor is liable for that amount.[5]

---

[5]Debtor averred that Plaintiffs did not suffer damages because a provision to the contract that dealt with possibility of JB Land's default provided that Plaintiffs may either retain their interest in lieu of payment or sell their interest and seek recoupment of the difference between the sale price and $125,000. It is true that Plaintiffs did not sell their interest in the parcel, but the parcel is

Plaintiffs have shown by a preponderance of the evidence that the court can, and does, find the five <u>Slyman</u> elements necessary to establish a case for non-dischargeability under § 523(a)(2)(A). Therefore, the court concludes that Plaintiffs claim is nondischargeable. Plaintiffs did not prove nor meaningfully argue at trial the elements of their second and third claims for relief under §§ 523(a)(4) and (6), respectively. Thus, because Plaintiffs succeeded on their first claim for relief and did not satisfy the burden of proof on their second and third claims they will not be discussed. Having concluded that Plaintiffs' claim for $125,000 is nondischargeable this court must now determine whether any additional damages are nondischargeable.

IV.     <u>DAMAGES</u>

Plaintiffs have proven that they are entitled to except $125,000 from discharge. Plaintiffs also seek prejudgment interest, punitive damages, and attorney's fees and costs of suit. For the reasons to be discussed, Plaintiffs are entitled to prejudgment interest but not entitled to punitive damages nor attorney's fees and costs of suit.

According to the terms of the contract, Plaintiffs were to be paid $125,000 on or before July 1, 2009; they were not paid. Thus,

---

currently worthless and Debtor offered no evidence rebutting that fact. Therefore, premising Plaintiffs' ability to recover damages on the "sale" of worthless property is an idle act and afforded no legal recognition. <u>See</u> CAL. CIV. CODE § 3532 ("The law neither does nor requires idle acts."). However, should Plaintiffs ever sell their interest in the parcel, the amount received from that sale would offset Debtor's liability.

Plaintiffs are entitled to prejudgment interest, at the rate of 10% per annum beginning on July 2, 2009.  CAL. CIV. CODE. §§ 3287, 3289(b).

In California, punitive damages are only allowed when the breach does not arise from a contractual obligation.  CAL. CIV. CODE § 3294. However, when the breach of a contractual obligation is *also* a tort punitive damages are recoverable.  <u>Frazier v. Metropolitan Life Ins. Co.</u>, 169 Cal. App. 3d 90 (1985).  In this case, Plaintiffs offered no evidence that Debtor committed a tort, and merely seek a determination that the liabilities established under the contract are not dischargeable because the contract was fraudulently obtained.  Thus, Plaintiffs are not entitled to punitive damages.

Section 1021 of the California Civil Procedure Code addresses attorney's fees: "[e]xcept as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties."  CAL. CIV. PROC. CODE § 1021.  The contract between Plaintiffs and Debtor did not contain a provision addressing attorney's fees and there was no evidence of an implied agreement regarding attorney's fees between the parties, therefore under section 1021 of the California Code of Civil Procedure, Plaintiffs are not entitled to attorney's fees and costs.

V.   <u>CONCLUSION</u>

For the reasons discussed above, Plaintiffs are entitled to a determination on the first claim for relief that the liability of $125,000 is not dischargeable as a result of Debtor's chapter 7

petition.  Additionally, Plaintiffs are entitled to a judgment on the first claim for relief in the amount of $125,000 plus prejudgment interest at the rate of 10% per annum from July 2, 2009.  Counsel for Plaintiffs is directed to lodge a form of Judgment consistent with this Memorandum Decision and should comply with B.L.R. 9021-1 and 9022-1.

* * END OF MEMORANDUM DECISION * *

COURT SERVICE LIST

James Wilkes Milnes
851 Cherry Ave., #27-412
San Bruno, CA 94066